**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                    Case No. 4:18-cv-351-AW-MAF

MELCHOR MUNOZ
a/k/a MELCHOR MUNOZ CORREA,

      Defendant.

_____/

**<u>FINAL ORDER</u>**

After Defendant Melchor Munoz was naturalized in 2009, he pleaded guilty to participating in a drug trafficking conspiracy that began in 2008. The United States then initiated this denaturalization action. The only issue is whether Munoz's drug trafficking began before his naturalization or after it. The matter proceeded to a bench trial, after which the parties submitted written arguments. As explained below, I conclude the government met its burden of proving that Munoz did, in fact, engage in drug trafficking before his 2009 naturalization. Munoz was thus ineligible for citizenship, and his citizenship accordingly must be revoked.

**I.**

Naturalization requires an applicant to demonstrate "good moral character" in the five years leading up to his application and through admission to citizenship. 8 U.S.C. § 1427(a)(3); 8 C.F.R. § 316.10(a)(1). An applicant who commits a

1

controlled substance or moral turpitude offense during this period is precluded from demonstrating good moral character. 8 U.S.C. § 1101(f)(3); 8 C.F.R. § 316.10(b)(2)(i), (b)(2)(iii). And a person who obtains citizenship despite his inability to demonstrate good moral character illegally procures it; "there must be strict compliance" with the statutory prerequisites to naturalization. *Fedorenko v. United States*, 449 U.S. 490, 506 (1981). In addition, a person who conceals or misrepresents a material fact in the application process illegally procures his citizenship. 8 U.S.C. § 1451(a). If the government establishes a citizen illegally procured his citizenship, courts must enter a judgment of denaturalization. *Fedorenko*, 449 U.S. at 517-18.

The government brought five counts under the denaturalization statute. *See* ECF No. 1; 8 U.S.C. § 1451(a). Counts One through Three each contend Munoz lacked good moral character because of his pre-naturalization drug trafficking. *See* ECF No. 1 ¶¶ 50-58 ("Commission of a Controlled Substance Offense"); *id.* ¶¶ 59-67 ("Crime Involving Moral Turpitude"); *id.* ¶¶ 68-77 ("Unlawful Act Adversely Reflecting on Moral Character"). Counts Four and Five contend Munoz provided false testimony in concealing his pre-naturalization drug trafficking. *Id.* ¶¶ 78-83 ("False Testimony"); *id.* ¶¶ 84-89 ("Willful Misrepresentation").

But each count turns on the sole remaining issue of fact: "whether Mr. Munoz committed a drug offense prior to his naturalization on September 8, 2009." ECF

2

No. 148 (Pretrial Order) at 28. So, the parties agree if the government can establish "that Mr. Munoz committed a drug offense during the statutory period, from March 24, 2004, through September 8, 2009, it will have satisfied every element for each of the five counts in the complaint (ECF No. 1)." *Id.*[1]

The government bears a heavy burden in proving that fact. It must do so by "clear, unequivocal, and convincing" evidence, which must "not leave the issue in doubt." *Fedorenko*, 449 U.S. at 505 (quoting *Schneiderman v. United States*, 320 U.S. 118, 125 (1943)). In practice, this standard is "substantially identical with that required in criminal cases—proof beyond a reasonable doubt." *Klapprott v. United States*, 335 U.S. 601, 612 (1949).

## II.

Munoz entered the United States from Mexico in 1992. He applied for citizenship in March 2009. Pretrial Order at 17-18. His application process involved three steps: An initial questionnaire (the Form N-400), an interview, and a naturalization ceremony. *Id.* at 18-20.

In his Form N-400 and at his interview, Munoz answered "no" to the following questions:

> Have you ever committed a crime or offense for which you were not arrested?

---

[1] I adopted the parties' proposed pretrial order at the trial's outset. ECF No. 159 at 4:13-16.

> Have you ever: Sold or smuggled controlled substances, illegal drugs, or narcotics?

*Id.* at 18. At his naturalization ceremony, he answered "no" to whether he had, since his interview, "knowingly committed any crime or offense, for which [he had] not been arrested," or "illicitly trafficked in drugs or marijuana." *Id.* at 19-20. At each step of the application process, Munoz attested that the information he provided was true and correct. *Id.* at 18-20. Munoz became a citizen in September 2009. *Id.* at 20.

Authorities arrested Munoz on drug trafficking charges in May 2011. *Id.* The operative indictment charged Munoz and others with drug trafficking "[b]etween on or about June 1, 2008, and on or about May 30, 2011." *Id.* at 21; *see also* ECF No. 1-2. Although he initially asserted innocence, Munoz pleaded guilty the morning his April 2012 trial was set to begin. As part of the change-of-plea process, Munoz signed a statement of facts, signed a plea agreement, and attended a plea hearing. Pretrial Order at 21-24. At each stage of the plea process, Munoz had the benefit of an interpreter. *Id.*

The Statement of Facts indicated Munoz sold marijuana from a residence on Smoky Lane "and elsewhere" between 2008 and 2010. *Id.* at 22; *see also* ECF No. 1-4. Munoz's lawyer advised him the Statement of Facts was the government's version of events and that Munoz was not agreeing to its accuracy by signing it. Pretrial Order at 23. Indeed, the Plea Agreement reserved the parties' right "to advise the District Court and other authorities of their versions of the circumstances

surrounding the offense" Munoz committed. *Id.* The Plea Agreement also advised Munoz that his conviction "may adversely affect" his immigration status and "may lead to revocation of his citizenship and deportation." *Id.*

At his change-of-plea hearing, Munoz offered his version of events:

THE COURT: I just need you to give me a summary, if you would, how the drug operation was working and what you did.

([*Defense counsel*] *confers with Munoz*.)

[MUNOZ]: I started getting and reselling.

THE INTERPRETER: I started getting and reselling.

[DEFENSE COUNSEL]: Explain the drugs.

[MUNOZ]: Late 2008 I started getting —

[DEFENSE COUNSEL]: Marijuana?

[MUNOZ]: Marijuana

THE COURT: All right. So late in 2008, you were receiving some marijuana.

[MUNOZ]: Yeah.

THE COURT: And then in turn you distributed that to others?

[MUNOZ]: Yes, sir.

THE COURT: And then at some point did you also become involved with cocaine?

[MUNOZ]: Yes, sir, 2010, end of the year.

5

ECF No. 1-5 at 10:3-21. In an April 2013 proffer interview with federal agents, Munoz again stated he began trafficking marijuana in late 2008 or early 2009. ECF No. 117-12 at 12:00-14:15.

Based on these facts, the United States filed its complaint to revoke Munoz's citizenship. ECF No. 1. A few months later, Munoz filed a § 2255 motion to vacate his conviction and sentence. ECF No. 9-1. Munoz argued his guilty plea was involuntary because his defense counsel "misadvise[ed] [him] regarding the impact that the conviction" would have "on his citizenship." *Id.* at 4. Munoz's defense counsel advised only that his conviction *could* affect Munoz's citizenship. *Id.* at 6. Effective counsel, Munoz argued, would have advised him that his conviction *would* affect his citizenship. *Id.* at 8. This court stayed these proceedings pending the outcome of Munoz's § 2255 challenge. ECF No. 13.

The district judge who sentenced Munoz denied the § 2255 motion. In November 2021, the Eleventh Circuit affirmed. *See Munoz v. United States*, 2021 WL 5175598, at *3 (11th Cir. Nov. 8, 2021). This case resumed, and the government moved for judgment on the pleadings. ECF Nos. 49, 59. Relying on principles of collateral and judicial estoppel, it contended Munoz was bound by his guilty plea (collateral estoppel) and his under-oath admissions at his change-of-plea (judicial estoppel). ECF No. 59 at 15-16.

This court granted the government's motion, ECF No. 62, but the Eleventh Circuit vacated and remanded. *United States v. Munoz*, 112 F.4th 923 (11th Cir. 2024). It concluded neither estoppel principle applied. *Id.* at 934, 936-37. As to collateral estoppel, it reasoned that the conspiracy's 2008 start date "was not a necessary part of" Munoz's underlying judgment for drug trafficking. *Id.* at 934. As to judicial estoppel, the court reasoned that although Munoz "affirmed that he started trafficking drugs in 2008," the underlying court did not rely "on the truth of Munoz's statement to adjudicate his guilt." *Id.* at 936. And it further reasoned that Munoz received no benefit pleading guilty to drug trafficking "*that started in 2008* rather than simply pleading guilty to the crime." *Id.*

After remand, the parties engaged in discovery. Munoz then moved for summary judgment arguing the government's evidence—Munoz's admissions—was insufficient as a matter of law. ECF No. 116 at 21-22. (By now, Munoz had recanted his previous admissions to selling drugs before 2009.) He also relied on the criminal doctrine of *corpus delicti* to argue the admissions were uncorroborated and could not independently serve as a basis to denaturalize. At the pretrial conference, this court denied Munoz's motion. I concluded Munoz's sworn admission, combined with (1) undisputed drug trafficking close in time to the disputed period, and (2) Munoz's undisputed relationship with some codefendants during the disputed period, presented enough evidence for trial. So that left Munoz's later recantation.

7

But that issue, I concluded, was one of credibility for trial. And although I concluded the *corpus delicti* doctrine had no application here, the government presented enough corroborating evidence to overcome it if it did apply.[2]

### III.

The most harmful witness for Munoz was Munoz himself. He testified at length over portions of two days, and although he testified that he began drug trafficking only after his naturalization, I found his testimony not credible, and I conclude based on his testimony that he did begin earlier. *See Silva v. Dos Santos*, 68 F.4th 1247, 1256-57 (11th Cir. 2023) (noting how "a factfinder can use a witness's noncredible testimony as corroborating substantive evidence against the witness's interests").

---

[2] In his trial brief, Munoz again raised the *corpus delicti* rule. ECF No. 141 at 6-7. Under that rule, the government must offer something more than a defendant's uncorroborated confession to support a conviction. *United States v. Morales*, 893 F.3d 1360, 1370-71 (11th Cir. 2018). The government must at least "introduce substantial independent evidence to establish the trustworthiness of the confession," though that evidence "doesn't have to prove the offense beyond a reasonable doubt, or even by a preponderance." *Id.* (cleaned up). *Corpus delicti* has no application here. For one, denaturalization proceedings under 8 U.S.C. § 1451(a) are civil, not criminal. *See Johannessen v. United States*, 225 U.S. 227, 242 (1912); *United States v. Koziy*, 728 F.2d 1314, 1320 (11th Cir. 1984). Regardless, the government does not rely on Munoz's confession alone to establish pre-naturalization trafficking. The parties agree there was post-naturalization trafficking close in time to the disputed period. ECF No. 159 (Day 1 Tr.) at 154:25-155:10. And Munoz admits maintaining a relationship with his co-conspirator before 2010. Day 1 Tr. at 165:13-166:13. Those undisputed facts support Munoz's confession to pre-naturalization trafficking and "justify [an] inference of its truth." *Morales*, 893 F.3d at 1371 (cleaned up).

Throughout his testimony, Munoz was evasive and did not answer questions directly. For example, asked if he entered the country "at a legal port of entry," Munoz twice responded that he "crossed with my friends." ECF No. 159 (Day 1 Tr.) at 92:16-22. After the government's insistence, Munoz said he "did not know" whether his entrance "was legal or not legal." *Id.* at 92:23-25. He seemed to land on legal, *id.* at 93:9-13, before ultimately professing ignorance to the terms "legal or illegal," *id.* at 94:12-16; *see also id.* at 112:4-11.[3] That evasiveness extended even to the mundane. When asked whether his Form N-400 included both typed and written responses, Munoz again resisted. *Compare* Day 1 Tr. at 122:1-7 ("Q. Mr. Munoz, I asked if you saw that the domestic violence arrest was typed. A. It's written there."), *with id.* at 122:21-24 ("Q. Okay. Do you see that there's a difference between gun without permit and domestic violence on this application? A. I didn't know that it was illegal to carry a weapon when I had bought it legally."); *see also* ECF No. 1-6 at 9 (displaying typed, black-ink response and written, red-ink response on Form N-400). He resisted answering again when the government asked if he intentionally

---

[3] This stands in contrast to Munoz's other testimony demonstrating familiarity with the immigration process and its nuances. He understood, for example, that committing a crime *after* naturalization afforded him protections against deportation unavailable to permanent residents. Day 1 Tr. at 242:1-22. He also applied for and obtained permanent residence status in 2004. *Id.* at 94:17-19. Against that backdrop, Munoz's expressed unawareness of "legal and illegal" forms of entry is unworthy of belief.

abstained from drug trafficking before naturalization to avoid deportation, *see* Day 1 Tr. at 139:22-142:14, 168:10-16, 182:14-22, when it asked about his presentence investigation report objections, *id.* at 192:22-193:21, and when it asked about his plea agreement, *id.* at 130:23-131:7, 131:22-132:22, 136:2-13, 138:3-5. Evidently, Munoz was capable of providing direct answers to his counsel, *see, e.g.*, Day 1 Tr. at 219:11-224:19, 251:4-252:2, even in response to more nuanced questions, *see, e.g., id.* at 240:8-241:11 (expressing his view on the legality of gun purchase), 256:22-257:23 (discussing acceptance of responsibility point at sentencing).

Munoz's testimony was also internally inconsistent. Munoz testified that he reviewed his presentence investigation report, Day 1 Tr. 177:20-22, though the next day he could not recall if he did. ECF No. 160 (Day 2 Tr.) 284:15-17. He said he avoided pre-naturalization trafficking because he "was concerned that [he] might be deported, and [he] wouldn't be able to see [his] daughters who were very young at that time," Day 1 Tr. at 242:1-6, but of course drug trafficking also portends prison and separation. He said he would not have pleaded guilty had he known the immigration consequences attached to his conviction, though he acknowledges hearing the federal prosecutor at his change-of-plea hearing note that Munoz's citizenship may be "subject to revocation." Day 2 Tr. at 282:10-24 ("It came as a surprise to me because I had never heard it before. It froze me up."). He said the plea

10

agreement was read and translated for him, Day 1 Tr. at 133:11-19, though later he said only that it could have been—he was unsure, *id.* at 136:6-8.

More significantly, Munoz was inconsistent in explaining why he testified under oath at his change-of-plea hearing that he began trafficking marijuana in late 2008 if, in fact, he did not start until after his 2009 naturalization. At different points in his testimony, he offered different explanations. One explanation was that the trial judge's question—"tell me in the time period from 2008 to 2011 what you were doing in the activities of distributing drugs. What was going on?"—left him dazed and confused, so he said whatever came to mind. Day 2 Tr. 280:17-281:22. Another was that his lawyer told him not to upset the judge by holding up the plea, so he said whatever would get it accepted, Day 1 Tr. 172:23-173:17, 179:11-16, 257:12-15, and another was that his lawyer coached him on what to say, *id.* at 191:17-192:5. (Including exaggerating drug use to qualify for rehabilitation programs in prison. *Id.* 184:19-185:2.) Still another was that he was under pressure to avoid a sure-loss at trial. *Id.* at 156:19-157:1.[4]

---

[4] In his answer to the government's complaint and in his § 2255 motion, Munoz's theory was that his defense counsel misadvised him concerning the consequences of his guilty plea. *See* ECF No. 9-1; ECF No. 53 at 6. Although not entirely inconsistent with his three other theories, it coheres better with some than with others. Munoz's inability to land on one explanation, though, evidences a calculated approach to see what sticks.

A witness's testimony can be so riddled with "hesitation, discomfort, arrogance, or defiance" that it leaves "no alternative but to assume the truth of what he denies." *Silva*, 68 F.4th at 1256 (cleaned up). Munoz's testimony is just such testimony. At any rate, I find his testimony noncredible, and I find it serves as substantive evidence that he did, in fact, traffic drugs before his naturalization. That finding alone is sufficient to conclude Munoz engaged in drug trafficking before his naturalization. *Swaters v. Osmus*, 568 F.3d 1315, 1323 (11th Cir. 2009) (noting determinations of credibility represent "independent" sources of support). But there is additional evidence further supporting that conclusion.

Beyond his own testimony at trial, the most harmful evidence for Munoz was his sworn statement at the change-of-plea hearing and his later admission during a 2013 proffer interview with federal agents.[5] In that 2013 interview with DEA and ICE agents, Munoz again admitted to trafficking drugs starting late 2008 or early

---

[5] The government argues Munoz "bears a heavy burden to show that his statements under oath during [his] plea hearing were false." ECF No. 167 at 6. That is not correct. Munoz is not seeking to withdraw a guilty plea, so the government's cases involving that situation are unhelpful. *See, e.g., United States v. Rogers*, 848 F.2d 166, 168 (11th Cir. 1988) (noting "heavy burden" in context of withdrawing guilty plea). As the parties stipulated, the government has the burden of proof here. It must prove Munoz began drug trafficking before his naturalization. It is not up to Munoz to prove otherwise. But although the government's assertion as to the burden is wrong, the government has met its burden of proof, as this order explains.

2009 with his coconspirator, Max Vaca-Soto. ECF No. 117-12 at 12:16-13:52. As with his sworn statement, Munoz too contested his 2013 admission.

Munoz contests the 2013 admission on a few grounds. First, he says when he stated he and Vaca-Soto met in 2008, the "agent never asked whether they began distributing drugs when they first met." ECF No. 170 at 28-29. (At trial, Munoz testified he and Vaca-Soto met working in the restaurant business. Day 1 Tr. at 246:14-19.) But context belies this testimony. When a federal agent asked Munoz why he would be introduced to Vaca-Soto, Munoz responded that Vaca-Soto was introduced to him through a drug "broker." ECF No. 117-12 at 13:10-13:17. The federal agent then asked Munoz "what happened" after he was introduced to Vaca-Soto, to which Munoz said he "started working" with "weed." *Id.* at 13:20-13:40. There is no evidence other than Munoz's say-so that he and Vaca-Soto "started working" in the restaurant industry as opposed to drug trafficking when they first met. That is not what he told agents in the recorded interview. Second, Munoz insists his language barrier created another hurdle undermining his 2013 admissions. ECF No. 170 at 30. It is undisputed that Munoz's first language is Spanish, that he relied on an interpreter at his change-of-plea hearing and sentencing (and this trial), and that the agents conducted the proffer session in English without an interpreter. But the two-hour audio proffer shows he can communicate well in English and that he engaged meaningfully with agents' straightforward questions of fact and chronology

13

concerning his drug trafficking. That is consistent with testimony from John White, an English speaker, who had "[n]o problem whatsoever" communicating with Munoz, Day 1 Tr. 217:13-15.

Munoz relied on a cognitive psychology expert—Dr. Deryn Strange—but her testimony did not help him. Dr. Strange specializes in how the human brain stores and retrieves memories. She specifically studies how—and to what extent—memories that begin as accurate reflections of objective reality (true memories) become distorted into false ones, "where the entire core of the memory is wrong." Day 2 Tr. at 306:8-24. Phrased differently, Dr. Strange studies "how our memories can become corrupted over time." Day 2 Tr. 302:23-303:1. I found her qualified as an expert and credible. Day 2 Tr. at 301:25-304:5. But most of her testimony was in the realm of common experience. She testified, for example, that people are more likely to recall more accurately memories or details that are important to them. Day 2 Tr. at 326:13-21. And that, under stress or other cognitive load (like speaking through a translator), recall accuracy likely diminishes. *Id.* at 332:8-334:5. But Dr. Strange's testimony does not change the fact that I found Munoz untruthful while testifying. Much of his testimony suggested calculated evasion or inconsistency, not sincere forgetfulness. Notwithstanding anything in Dr. Strange's testimony, I find that Munoz did not misremember when he began trafficking.

14

Dr. Strange also testified that people may misremember details when they are exposed to questions or remarks suggesting inaccurate information. Day 2 Tr. at 340:8-342:22. The "misinformation effect," as Dr. Strange called it, shows "we tend to accept . . . misleading information" concerning relatively unimportant details if it is suggested to us. *Id.* at 339:15-22, 340:8-15, 341:19-24. For example, a person might come to hold a good-faith but mistaken belief about what year they started a job if someone suggests an incorrect year. *Id.* at 341:13-18; *see also id.* at 340:25-342:12. But the misinformation effect is not consistent with Munoz's theory here. Munoz testified not that he genuinely but mistakenly believed he started trafficking drugs in 2008 when he said it at his change-of-plea hearing. Instead, he testified he said "2008" either out of in-the-moment confusion, or intentionally after having been coached by his attorney, or out of fear a different answer would result in rejection of his plea and a sure-loss at trial.[6] Indeed, he insisted he knew at that time that 2008

---

[6] Some of Munoz's theories do not square with the change-of-plea transcript itself. For example, although Munoz testified he worried about upsetting the trial judge, the judge went to great lengths to accommodate and encourage Munoz. ECF No. 1-5 at 3:19-21 ("Mr. Munoz, you heard [counsel's] indication that you wish to enter a guilty plea in the case. You don't have to do that. Whether to plead guilty or not is entirely up to you."); *id.* at 4:5-12 ("It's very important that you answer all of my questions truthfully and completely . . . . If you don't understand a question, please just tell me. . . . We'll back up and go over things again. We will do whatever we need to do to make sure that you and I are communicating fully."). And Munoz's counsel offered challenges at the hearing (without drawing the judge's ire). *Id.* at 9:5-20. The judge also questioned whether Munoz understood and agreed with "every word" of his Plea Agreement and Statement of Facts. *Id.* at 17:13-22.

was wrong, testifying he told his lawyer to fix the dates. Day 1 Tr. at 229:7-23, 251:9-13. (His lawyer never did, *see id.*) Dr. Strange's testimony about how people might misremember (a commonsense understanding) is not helpful here; it does not align with Munoz's testimony. Further, I find Munoz did not misremember. I find he was answering truthfully to the trial judge, and that he had started drug trafficking in 2008.

Next, Munoz puts much emphasis on his assertion that he did not obtain the Smoky Lane residence until 2010 (after his naturalization). *See* Day 1 Tr. 225:22-226:3. It was at the Smoky Lane residence that the Statement of Facts said Munoz stored and sold drugs beginning in 2008. Pretrial Order at 22. Munoz called John White, who owned the Smoky Lane residence and sold it to Munoz in either a lease-to-own or a contract-for-deed sale. Day 1 Tr. 214:21-24. But neither White nor Munoz offered any evidence that established the timing of Munoz's purchase. The purchase itself is not well documented, Day 1 Tr. at 213:2-6 ("[O]nce he paid me off, I had no reason to keep the paperwork."), *id.* at 215:5-10 (no record of checks), so Munoz could only establish timing through his testimony or White's. And while I found White's testimony and demeanor credible, he remembered few details about the property sale. He could not quite recall what form it took, Day 1 Tr. at 214:21-215:1, or what year Munoz started leasing the property. Day 1 Tr. at 217:18-24. While he recalled transferring the deed in 2017, *id.* at 216:2-7, the most significant

16

fact is when Munoz had access to Smoky Lane. In that respect, neither Munoz nor White offer much at all (not even the deed evidencing that transfer).[7]

In any event, even if Munoz could prove he bought the Smoky Lane residence in 2010, it makes no difference. Although the Statement of Facts said Munoz trafficked drugs at Smoky Lane "and elsewhere," I need not and do not rely on it for its truth.[8] The government need not prove Munoz stored, sold, or trafficked drugs at Smoky Lane or any other specific location. It need only prove that his drug trafficking (wherever it was) began before September 2009. Neither White nor Munoz's testimony concerning the Smoky Lane residence addresses that.

*    *    *

In sum, I conclude the government has proven by clear, unequivocal, and convincing evidence that Munoz engaged in drug trafficking in 2008, just as he stated under oath at his change-of-plea hearing.

---

[7] Munoz apparently consulted the property deed to confirm the 2017 transfer, Day 2 Tr. 279:20-280:3, but he never introduced it into evidence.

[8] At the pretrial stage, Munoz sought discovery from the government concerning the informant who claimed to "pick[] up marijuana from Munoz at Smoky Lane and elsewhere" between 2008 and 2010. ECF No. 1-4 at 6; *see, e.g.*, ECF No. 110. The government disclaimed any reliance on the informant, ECF No. 115 at 5, and did not call him at trial.

**IV.**

Finally, I will briefly address the parties' disputes about the admissibility of some evidence.

First, Clyde Taylor—Munoz's counsel at the time of his plea—passed away shortly before trial. Munoz submitted Taylor's declaration, seeking to admit it under Federal Rule of Evidence 807. ECF Nos. 117-1 (Taylor Decl.), 142. That rule allows hearsay statements that are "supported by sufficient guarantees of trustworthiness" and that are "more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts." Fed. R. Evid. 807. Even assuming it bears sufficient indicia of trustworthiness, Taylor's declaration is not more probative than his deposition testimony or Munoz's testimony. Taylor's declaration largely recasts his deposition testimony. *Compare, e.g.*, Taylor Decl. ¶¶ 16, 34, *with, e.g.*, ECF No. 117-3 (Taylor Depo. Tr.) 87:14-16 ("I don't think that's—that came up as far as me discussing with my client, you could lose your citizenship."), 120:4-121:20. Taylor's new facts—which Munoz categorizes as "most critical[]"—are couched with qualification. *See, e.g.*, Taylor Decl. ¶ 31 ("In other words, I might have coached Mr. Munoz to say that he distributed drugs in 2008."). And in any event, Taylor and Munoz testified directly about Taylor's perceived coaching and inordinate focus on sentence reduction over timeline disputes. *See, e.g.*, Taylor Depo. Tr. 110:9-15 ("I had taken off my trial hat

18

and put on my plea hat" in an effort to minimize Munoz's sentence range, and "that's everything that I was thinking of candidly at that point"); 74:8-76:12 (noting the 2008 conspiracy "was the weakest," but "even if we won 2008, it didn't take the weights, the overall weights down below 3000 kilograms."); *cf. id.* 112:12-114:6 (noting "it was not even close to being worth the gamble" to dispute Munoz's timeline at sentencing). So I decline to consider Taylor's declaration under Rule 807. And even if I did, the outcome would be the same. Nothing in Taylor's declaration would convince me that Munoz was truthful at trial or untruthful at his plea hearing.

Next, Munoz contends the government failed to provide full disclosure concerning the expected testimony of agent Kevin Whittle. ECF No. 170 at 13. In response to Munoz's interrogatory seeking Whittle's anticipated testimony, the government responded that he would testify to the operative indictment, Munoz's Statement of Facts, Munoz's plea hearing statements, and Munoz's 2013 proffer interview. *Id.* at 39-42. Accordingly, Munoz asks Whittle's testimony concerning the investigation into Munoz be stricken. *Id.* But I need not rely on Whittle's testimony to support any of my findings. Much of what he testified is common sense—e.g., that complex drug trafficking operations do not start overnight. And although he testified Munoz had "many," "sophisticated" phone calls "recorded in English," Day 1 Tr. at 34:14-21, 85:15-86:7, White's testimony and the 2013 proffer interview audio already independently show Munoz's ability to speak and

19

understand English. Moreover, I found Munoz's testimony on that point—an inability to meaningfully engage in even basic English conversations—not credible. I thus need not and do not consider Whittle's testimony concerning his personal knowledge of the investigation. Moreover, I need not and do not consider Munoz's pre-sentence investigation report for its truth. ECF No. 170 at 44-48.

### CONCLUSION

The government has shown that Munoz illegally procured his citizenship. This court must now revoke and set aside the naturalization order and cancel the certificate of naturalization. *See* 8 U.S.C. § 1451(a); *United States v. Jean-Baptiste*, 395 F.3d 1190, 1192 (11th Cir. 2005).

The clerk will enter judgment that says: "Judgment is ENTERED in favor of the United States of America and against Defendant Melchor Munoz. The Court FINDS and DECLARES that Munoz illegally procured his United States citizenship. The order admitting Munoz to United States citizenship is REVOKED and SET ASIDE, effective as of the original date of that order, dated September 8, 2009. Certificate of Naturalization No. 32588918 is CANCELED. Munoz is forever RESTRAINED and ENJOINED from claiming any rights, privileges, benefits, or advantages under any document which evidences United States citizenship obtained as a result of his September 8, 2009 naturalization."

20

Munoz shall, within ten days of this Order, surrender and deliver his Certificate of Naturalization, any and all U.S. passports, and any other indicia of United States citizenship, as well as any copies thereof in his possession or control (and shall make good faith efforts to recover and then surrender any copies thereof that he knows are in the possession or control of others) to counsel for the United States.

Within 21 days, the United States must file a notice stating whether Munoz has complied with the court's judgment. If the notice indicates he has not, the court will schedule a compliance hearing.

The clerk will close the file. The clerk will also send a copy of this order and judgment to the Attorney General pursuant to 8 U.S.C. § 1451(f).

SO ORDERED on March 18, 2026.

s/ *Allen Winsor*
Chief United States District Judge

21